In the Matter of the Probate of the Last Will and Testament of JOHN MURPHY, Deceased.

JAMES HORTON and Others, Appellants; PATRICK J. CANNON and Another, as Executors. etc., of JOHN MURPHY, Deceased, Respondents.

*Physicians — disclosure of professional information on the contest of a will — waiver — Code of Civil Procedure, § 836, as amended by chapter 295 of 1893.*

The purpose of the amendment, made by chapter 295 of the Laws of 1893, to section 836 of the Code of Civil Procedure was to open more widely the door to the introduction of the evidence of medical attendants upon a deceased person, when the validity of his will should be called in question.

Before this amendment the right to waive the provisions of section 834 of said Code forbidding a physician or surgeon to disclose any information as to the mental or physical condition of a deceased patient which he acquired while attending the patient professionally was, in a contest relating to the validity of his will, confined to his executors, but it is now extended to the surviving husband, widow, or any heir at law, or any of the next of kin, or any other party in interest.

APPEAL by the contestants, James Horton and others, heirs at law and next of kin of John Murphy, deceased, from a decree of the Surrogate's Court of the county of Niagara, entered in said Surrogate's Court on the 16th day of September, 1893, admitting to probate a certain paper purporting to be the last will and testament of John Murphy, deceased.

FIFTH DEPARTMENT, MARCH TERM, 1895.　　　　[Vol. 85.

*P. F. King* and *Charles Hickey*, for the appellants.

*E. J. Taylor* and *John E. Pound*, for the respondents.

BRADLEY, J.:

On December 20, 1892, the decedent was a resident of the city of Lockport, N. Y. He had reached the age of eighty-seven years. He had become feeble and was confined to his bed. His property, mostly personal, amounted to about $25,000. He had been twice married and was a widower, and had no children living. He was survived by grandchildren, a sister and nephews and nieces. On the morning of that day his attendants, thinking he was in a dying condition, sent for the priest, who came, and after an interview with Murphy he went out and shortly after returned with a lawyer. The will was then drawn, persons were called to subscribe it as witnesses, and the will was executed. By it he gave to St. Patrick's Roman Catholic Church of Lockport $1,000; to his nephew William Murphy, $1,000; to his nephews and nieces James Horton, John Horton, Samuel Horton, Nicholas Horton, Sarah Horton and Ellen Horton $500 each; to his nephew James Kelly, a house and lot; to Luke Mullett about $2,500, by abatement of that amount of his bond and mortgage held by the decedent, and to the Right Rev. Stephen V. Ryan, of Buffalo, N. Y., all the rest, residue and remainder of his estate, and he appointed Rev. Patrick J. Cannon, the priest before mentioned, and Michael Mullett, as executors of the will. It is urged on the part of the contestants: (1) That Murphy was incompetent to make a will; and (2) that it was the product of undue influence.

He had formerly been an active, vigorous man. But for about twelve years before his death he had been more slovenly in his personal habits and somewhat secluded. He had a severe sickness about one year before his death, and afterwards, about three weeks before he died, he was by illness confined to his bed, and so continued until his death, December 28, 1892. There was much evidence given on the part of the contestants relating to his appearance, conduct and habits during the last year of his life, and to his appearance during his last illness, tending to prove his indifference to matters to which his attention was called, and a failure to recognize his intimate friends and acquaintances, and other circumstances

bearing upon his apparent mental condition, from which the inference was permitted that at the time the will was made he was not capable of comprehending the condition of his property and his relations to those who might become the objects of his bounty, and the scope and bearing of the provisions of his will. His condition had become alarming to his attendants when the priest was sent for. This was done without his knowledge. The priest came and after remaining alone with Murphy for some time departed and soon after returned with a lawyer, by whom the will was drawn in the presence only of the priest and the decedent. Then the subscribing witnesses were called in and the will was in due form executed. In view of these facts and of the provisions of the will it is urged, in addition to the charge of mental incompetency of Murphy, that it was the result of undue influence upon him.

The evidence of what took place relating to the will before and at the time it was drawn is in the evidence of the priest only, and is to the effect that Murphy requested him to draw his will. He declined, saying he would get a lawyer. He did so, and when he returned with the lawyer the priest suggested to Murphy that it would be proper for him to leave something to the church, and the latter concluded to give $1,000 to it. Thereupon, inquiring to whom he wished to leave other portions of his property, he proceeded to give the names of those to whom specific legacies were given. Then, being asked what he wanted to do with the rest of his estate, he said to the priest, " Take it and do what you like with it," that " he didn't know what he would do with it." The priest said that would not do, he did not want it, and finally suggested that he could leave it to the bishop, to which he consented, and the residuary clause to that effect was added. The evidence of the priest is to the effect that the provisions of the will were the result of voluntary action and direction of Murphy; that he expressed a desire to give the residue of his estate to some charitable purpose, and on the suggestion of the priest, who advised him that it was probably too late for that, in view of the short time he might live, he made the bishop, with whom he had no personal acquaintance, the residuary legatee.

His securities and money, which constituted the most of his estate, were by his direction handed over to and taken by the priest into his possession shortly after the will was executed. And there is

some evidence of Murphy's subsequent declarations in recognition of the will and tending to indicate his understanding of its provisions. The fact that none of his four grandchildren had any consideration by his will may not be so remarkable as it would seem if his relations with them had been intimate. They were the children of the issue of his first marriage in Canada. He there separated from his wife and came into this State, and never after cohabited with her, nor, so far as appears, did he have any communication with her or with the child or grandchildren. He for some time prior to his last sickness had been very penurious in his habits, so much so that he had denied to himself the comforts of life, although he had money and available productive securities. At the time he made the will, he evidently was very sick. He previously and on that day suffered much pain. And it may be that he had then become satisfied or apprehensive that his continued life would be brief. This may account somewhat for his willingness or desire that his assets be taken by the priest into his possession.

It does not appear that he had ever before made any will or expressed any desire about the ultimate disposition or distribution of his property. And it may be that, but for the suggestion then made to him upon the subject, no will would have been executed. It is also urged as improbable that Murphy intelligently placed in the priest the confidence indicated by the will, and by handing the property over to him, because, as there is evidence tending to prove, Murphy had not for some years manifested any interest in the church, and had spoken of the priest in terms harsh and derogatory. The significance of his remarks referred to is dependent upon the circumstances under which they were made, and which do not very clearly appear. Upon the evidence as a whole, the question was one of fact whether the will as made expressed the intelligent and voluntary purpose of the deceased.

On the part of the contestants, Thomas B. Cosford, a practicing physician and surgeon of some years' experience, was called as a witness, and testified that he professionally attended Murphy from the 8th day of December, 1892, until his death. Thereupon the heirs and next of kin of the decedent waived the provisions of section 834 of the Code of Civil Procedure so far as they were applicable to the witness, and offered to prove by him that, from the time

he commenced attending him on December 8, 1892, to the time of his death on the twenty-eighth of that month, he was continuously delirious, and of unsound mind and incompetent to make a will. The evidence so offered was excluded upon the objection of the proponents, who were the persons named as executors in the will, and exception was taken.

Prior to the amendment in 1893, of section 836 of the Code, the objection would have been well taken. (*Renihan* v. *Dennin*, 103 N. Y. 573; *Matter of Coleman*, 111 id. 220.)

The amendment took effect fifteen days before the evidence was offered, and, as amended, the section contains the following provisions: "But a physician or surgeon may, upon a trial or examination, disclose any information as to the mental or physical condition of a patient who is deceased, which he acquired in attending such patient professionally, except confidential communications and such facts as would tend to disgrace the memory of the patient, when the provisions of section 834 have been expressly waived on such trial or examination by the personal representatives of the deceased patient, *or if the validity of the last will and testament of such deceased patient is in question by the executor or executors named in said will, or the surviving husband, widow, or any heir at law or any of the next of kin of such deceased, or any other party in interest.*" (Code Civ. Proc. § 836, as amended by chap. 295 of 1893.)

The amendment of 1893 had relation only to such waiver when the validity of the last will and testament of a decedent is in question. Before then, in such case, the right of waiver was solely with the executors named in the will. It is now urged on the part of the proponents that it was the legislative intent that all persons coming within the relations there mentioned should unite to create the waiver, and, therefore, the word " or " should be treated as " and ", for the purposes of the interpretation of the amendment. It cannot reasonably be so construed. The purpose of the amendment evidently was to open more widely the door to the introduction of the evidence of medical attendants of a deceased patient when the validity of his will should be in question. The right of waiver was, therefore, extended to others having the relations mentioned to the deceased, and to those having the legal relation of parties in interest, and who are properly in the action or proceeding in which the

question arises before the court. There is no question of public policy, recognized at common law, involved. The restriction, so far as it exists in such case, is statutory only. (1 Greenl. on Ev. § 248; *Rex* v. *Gibbons*, 1 C. & P. 97.)

It follows that the exclusion of the evidence of the doctor thus offered was error. And as the contestants may have been prejudiced by its exclusion the decree of the Surrogate's Court must be reversed and a new trial granted, with costs of this appeal payable out of the estate to abide the event. And as the evidence presents questions of fact such new trial should be had at the Circuit Court of Niagara county of the questions: *First*. Did the decedent John Murphy at the time of the execution of the will on the 20th day of December, 1892, have testamentary capacity?

*Second*. Was the instrument purporting to be the last will and testament of the decedent voluntarily made by him?

*Third*. Was the execution by the said decedent of the instrument purporting to be his last will and testament of date December 20, 1892, procured by fraud, circumvention or undue influence practiced upon him?

DWIGHT, P. J., and LEWIS, J., concurred.

Decree of the Surrogate's Court reversed and trial of issues of fact at the Circuit Court of Niagara county ordered as stated in opinion.